# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

ELIZA RANOLA,

       Plaintiff,

vs.

EQUIFAX INFORMATION SERVICES, LLC, and TRANS UNION LLC,

       Defendants.

Case No.: 3:25-cv-470

**JURY TRIAL DEMANDED**

## COMPLAINT

Eliza Ranola ("Plaintiff" or "Ms. Ranola") brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax") and Trans Union LLC ("Trans Union") (collectively "Defendants") for actual, statutory, and punitive damages and costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et. seq.*, arising out of Defendants' mixing Plaintiff's credit file with another consumer.

## INTRODUCTION

1.    The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal

Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting convenience and efficiency.

2.    However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.    The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.    These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.     Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.     "Credit is the lifeblood of the modern American economy, and for the American consumer access to credit has become inextricably tied to consumer credit scores as reported by credit reporting agencies." *Burke v. Experian Info. Sols., Inc.*, 2011 WL 1085874, at *1 (E.D. Va. Mar. 18, 2011).

7.     Congress made the following findings when it enacted the FCRA in 1970:

(a)    The banking system is dependent upon fair and accurate credit reporting.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

(b)    An elaborate mechanism has been developed for investigating and evaluating the credit worthiness, credit standing, credit capacity, character, and general reputation of consumers.

(c)    Consumer reporting agencies have assumed a vital role in assembling and evaluating consumer credit and other information on consumers.

(d)    There is a need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy.

15 U.S.C. § 1681(a)(1-4).

8.    Thus, one of the fundamental purposes of the FCRA is "to require that consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information in accordance with the requirements of this subchapter."   15 U.S.C. § 1681(b). Accordingly, "[t]he FCRA evinces Congress' intent that consumer reporting agencies, having the opportunity to reap profits through the collection and dissemination of credit information, bear 'grave responsibilities.'" *Cushman v. Trans Union*, 115 F.3d 220, 225 (3d Cir. 1997).

9.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin her reputation without cause, and make her unemployable or uninsurable, as well as deny her the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of her good name without her knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

10.     Since 1970, when Congress enacted the Fair Credit Reporting Act, as amended, 15 U.S.C. § 1681 *et. seq.*, ("FCRA"), the federal law has required CRAs to have in place and to utilize reasonable procedures "to assure the maximum possible accuracy" of the personal and financial information that they compile and sell about individual consumers.

11.     The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from her or her credit and obtaining new credit.

12.     In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S.C. § 1681(a)(4).

13.     The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness

or accuracy of any information it provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

14.    A recurring and *known* issue within the credit reporting industry is the creation of "mixed files."

15.    A "mixed file" occurs when personal and credit information belonging to Consumer B appears in one or more of Consumer A's credit files.

16.    "Mixed files" create a false description and representation of a consumer's credit history.

17.    The Federal Trade Commission defined a mixed credit file as a file that "refers to a Consumer Report in which some or all of the information pertains to Persons other than the Person who is subject to that Consumer Report." *F.T.C. v. TRW, Inc.*, 784 F. Supp. 361, 362 (N.D. Tex. 1991).

18.    Mixed files are not a new phenomenon. Defendants have been on notice of the existence of mixed files, and the fact that their procedures for creating credit files, including their matching algorithms, are prone to frequently cause mixed files, for over thirty (30) years. *See Thompson v. San Antonia Retail Merchants Ass'n*, 682 F.2d 509, 511 (5th Cir. 1982).

19.    More recently, Defendants have been the subject of numerous state attorney general actions relating to their mixed file problem.

20.    For example, in 2015, the New York Attorney General filed charges and settled claims with Defendants over mixed files.[1]  *See In the Matter of Eric T. Schneiderman, Attorney General of the State of New York v. Experian Information Solutions, Inc.; Equifax Information Services, LLC; and Trans Union LLC.*

21.    Notwithstanding Defendants' notice and being subject to repeated enforcement actions, mixed files continue to occur despite consumers' unique personal identifying information, such as Social Security numbers, date of birth, and addresses.

22.    Another consequence of mixed files is the resulting disclosure of a consumer's most personal identifying and financial information absent the consumer's knowledge or consent, or both.  This occurs when a consumer's file is mixed with that of another consumer, and either of those consumers applies for credit, housing, insurance, or employment, and Defendants sell information pertaining to one consumer in response to the application of the other.

23.    Defendants have been sued thousands of times wherein an allegation was made that Defendants violated the FCRA.  Moreover, Defendants are sued, at a minimum, hundreds of times each year wherein an allegation is made that Defendants mixed a consumer's credit file with that of another consumer.

---

[1] https://ag.ny.gov/press-release/2015-ag-schneiderman-announces-groundbreaking-consumer-protection-settlement-three Last visited May 17, 2022; *see also* https://ag-ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf Last visited May 17, 2022.

24.     FCRA lawsuits have resulted in multi-million-dollar verdicts for consumers who fall victim to a mixed credit file.

25.     For example, in 2002, the jury in *Judy Thomas v. Trans Union LLC*, District of Oregon, Case NO. 00-1150-JE, found Trans Union had willfully violated the FCRA by mixing Judy Thomas's personal and credit information with another consumer's and failing to unmix them despite Ms. Thomas' numerous disputes.  The jury awarded Ms. Thomas $300,000.00 in actual damages and $5,000,000.00 in punitive damages.  Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

26.     In 2007, the jury in *Angela Williams v. Equifax Information Services, LLC*, Circuit Court for Orange County Florida, Case No. 48-2003-CA-9035-0, awarded Angela Williams $219,000.00 in actual damages and $2,700,000.00 in punitive damages for willfully violating the FCRA by mixing Angela Williams with another consumer and failing to unmix them despite Ms. Williams' disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

27.     In 2013, the jury in *Julie Miller v. Equifax Information Services, LLC*, District of Oregon, Case No. 3:11-cv-01231-BR, awarded Julie Miller $180,000.00 in actual damages and more than $18,000,000.00 in punitive damages for willfully violating the FCRA by mixing Julie Miller with another consumer and failing to

unmix them despite Ms. Miller' numerous disputes. Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

28.    More recently, a jury assessed a $60 million dollar verdict against Trans Union for mixing innocent persons as terrorists and drug dealers by matching consumers with the Office of Foreign Asset Control's "terrorist alert" list based on first and last name alone. *See Ramirez v. Trans Union, LLC*, No. 12-CV-00632-JSC, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *aff'd in part, vacated in part, rev'd in part sub nom. Ramirez v. TransUnion, LLC*, 951 F.3d 1008 (9th Cir. 20020). Despite the verdict, Defendant continues to mix consumers' credit files with other consumers' credit files.

29.    "Evidence that a defendant has repeatedly engaged in prohibited conduct while knowing or suspecting that it was unlawful would provide relevant support for an argument that strong evidence is required to cure the defendant's disrespect for the law." *Dalton v. CAI*, 257 F.3d 409, 418 (4th Cir. 2001) (noting that whether "other consumers have lodged complaints similar to Dalton's against CAI" is relevant to willfulness under the FCRA). Moreover, repeated noncompliance with statutory duties can establish that the defendants acted willfully. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007) (punitive damages can be awarded based on "reckless disregard for a statutory duty").

30.    No less than three federal Courts of Appeal have held a consumer reporting agency violates 15 U.S.C. § 1681e(b) and may be found to have willfully violated the FCRA when it mixes a consumer's file with another consumer.

31.    Notably, the Federal Trade Commission has specifically warned consumer reporting agencies, including Defendants, to review their procedures when a mixed file occurs.

32.    Despite federal and state law, Congressional mandate, federal and state enforcement actions, and thousands of consumer lawsuits, mixed credit files remain a significant problem for innocent consumers, including Plaintiff.

33.    Plaintiff's claims arise out of the Defendants' blatantly inaccurate credit reporting, wherein Defendants published in a consumer report about Plaintiff the information of another consumer because Defendants mixed Plaintiff's credit file with that of an unrelated consumer.

34.    Further, Plaintiff's claims also arise out of Defendants' blatantly inaccurate credit reporting, wherein Defendants permitted the impermissible access to Plaintiff's credit file when it published a consumer report about Plaintiff in response to a credit application submitted by and pertaining to an unrelated consumer because Defendants mixed Plaintiff's credit file with that of an unrelated consumer.

35.    Accordingly, Plaintiff brings claims against Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b); for failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and in fact, the product of a mixed file, and for failing to delete the disputed information from Plaintiff's credit file, in violation of the FCRA, 15 U.S.C. § 1681i; and for selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer, in violation of the FCRA, 15 U.S.C. § 1681b(a).

36.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from the Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## **PARTIES**

37.    Eliza Ranola ("Plaintiff" or "Ms. Ranola") is a natural person residing in Jacksonville, Florida, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

38.    Defendant Equifax Information Services, LLC ("Defendant" or "Equifax") is a corporation with a principal place of business located at 1550 Peachtree Street NW, Atlanta, Georgia 30309 and can be served through its

registered agent Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, Georgia 30092, and is authorized to do business in the State of Florida, including within this District.

39.    Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

40.    The information Equifax collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans.  Equifax also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

41.    Equifax collects and maintains such information about consumers, whether consumers like it or not.  Consumers do not have a choice as to whether Equifax collects and maintains information about them.  Not only that, but consumers cannot remove information that Equifax collects and maintains about them from the Equifax database. Further, Equifax sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Equifax sold.

42.    Defendant Trans Union, LLC ("Defendant" or "Trans Union") is a corporation with a principal place of business located at 555 West Adams Street, Chicago, Illinois 60661 and can be served through its registered agent Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, Illinois 62703, and is authorized to do business in the State of Florida, including within this District.

43.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

44.    The information Trans Union collects, maintains, and sells includes confidential details about the income, finances, credit histories, address histories, application histories, credit review histories, and employment histories of 245 million Americans.  Trans Union also collects consumers' personal identifiers, such as Social Security Numbers ("SSNs"), dates of birth, telephone numbers, and addresses.

45.    Trans Union collects and maintains such information about consumers, whether consumers like it or not.  Consumers do not have a choice as to whether Trans Union collects and maintains information about them.  Not only that, but consumers cannot remove information that Trans Union collects and maintains about

them from the Trans Union database. Further, Trans Union sells that information about consumers for its unilateral profit, none of which is shared with the Plaintiff, who is the subject of the very data that Trans Union sold.

## JURISDICTION AND VENUE

46.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

47.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## SUMMARY OF THE FAIR CREDIT REPORTING ACT

48.    The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

49.    The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their

grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

50.    Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

51.    To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

52.    The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

## DEFENDANTS' PROCESSING OF CREDIT INFORMATION

53.    Defendants regularly receive information from various sources around the country including banks, credit unions, automobile dealers, student loan providers, public information vendors, and others.

54.    These sources are known as "furnishers" within the credit reporting industry and under the FCRA.

55.    Defendants collect information from thousands of furnishers.

56.    The process by which Defendants receive, sort, and store information is largely electronic.

57.    Furnishers report credit information to Defendants through the use of coded tapes that are transmitted to Defendants on a monthly basis through software known as Metro 2.

58.    Defendants take credit information reported by furnishers and create consumer credit files.

59.    Defendants maintain credit files on more than 200 million consumers.

60.    Credit files are updated electronically by the furnishers to reflect new information regarding the reported accounts (sometimes referred to within the industry as "tradelines").

## DEFENDANTS' MIXED FILE PROBLEM

61.    Defendants know that different consumers have similar names.

62.    Defendants know that different consumers can have similar Social Security numbers.

63.    Defendants know that different consumers with similar names can also have similar Social Security numbers.

64.     Defendants know that public records often do contain identifying information such as Social Security numbers or dates of birth.

65.     Defendants match tradelines and public records to a consumer credit file by comparing the information about the consumer associated with the tradeline or public record to the information they maintain about the consumer in the consumer's credit file or files.

66.     Defendants accomplish this matching of credit information to consumer credit files through the use of certain matching algorithms or database rules.

67.     From time to time, Defendants' matching algorithms match information belonging to one consumer to the credit file of another consumer; resulting in what's commonly known as in the credit reporting industry as a mixed or merged credit file.

68.     Mixed files are not a new phenomenon.  In fact, as long ago as the early 1990s, the Federal Trade Commission ("FTC") (the government agency charged with enforcement of the FCRA), entered into individual Consent Decrees with each of the major CRAs, specifically including Defendants, regarding its significant failures and deficiencies with respect to mixed files.

69.     Despite Defendants' long-standing and specific knowledge of the mixed file problem, Plaintiff's credit report was still generated by Defendants containing information belonging to another consumer.

70.    A mixed or merged credit file is the result of Defendants' inaccurately mixing personal identifying information and credit information and/or an entire credit file belonging to one consumer into the credit file of another consumer.

71.    There are many different possible causes for the mixing of credit files but all of them relate in one way or another to the algorithms and/or database rules used by Defendants to match personal identifying information and credit information, including public record information, to a particular consumer's credit file.

72.    The success or failure of these algorithms or rules is both a function of the rules themselves and of the information provided by the furnishers of the tradeline information to Defendants.

73.    A mixed consumer report could be caused by an improper algorithm just as it could be caused by the inaccurate reporting of a consumer's personal "indicative" information (e.g., name, Social Security number, address, date of birth, etc.) by the furnishers to Defendants.

74.    Accordingly, the database rules determine which credit files are selected by the algorithm and merged to create a complete consumer report.

75.    Therefore, a mixed consumer report is sometimes the result of the mixing of two or more consumer credit files belonging to different consumers into one consumer report.

# FACTUAL ALLEGATIONS

## Plaintiff and Sister's Mixed File History

76.    In or around 2020, after Plaintiff finished an ICU nurse fellowship, Plaintiff wanted to purchase a vehicle and applied for an auto loan. Plaintiff loan application was denied due to derogatory information on her credit reports.

77.    Plaintiff was shocked because she was not aware of any derogatory accounts and was making timely payments on all of her credit obligations. Plaintiff explained this to the individual that submitted the loan application. The representative verbally listed multiple derogatory accounts that he saw on Plaintiff's credit reports.

78.    Plaintiff realized that these accounts did not belong to her, but to her older sister Elika Ranola Edwards.

79.    Plaintiff's father offered to transfer her newer vehicle, which still had a loan in her name, to Plaintiff to help her boost her credit while she disputed the accounts appearing in her credit files that do not belong to her. However, when they tried to transfer both the car and loan into Plaintiff's name the lender did not approve the request due to the derogatory accounts appearing in her credit file.

80.    As a result of derogatory accounts appearing on Plaintiff's credit report, she was forced to make payments to her father while the loan remained in her name, which was extremely embarrassing.

81.    Plaintiff's full name is Eliza Villanueva Ranola and she was born in 1988.

82.    Plaintiff's sister's name was Elika Villanueva Ranola until 2016 when she got married and added her married name last name Edwards.  Elika Ranola Edwards was born in 1986, and in a different month than her sister.

83.    In or around 2020, Plaintiff called Equifax, Trans Union, and Experian to dispute the accounts on her credit report that did not belong to her.

84.    Upon information and belief, one or more of the CRAs asked Plaintiff to fax them her and her sister's identifying documents.  Plaintiff provided the requested information.

85.    Upon information and belief, Non-Party Experian Information Solutions, Inc. ("Experian") corrected Plaintiff's report following the 2020 dispute.

86.    Upon information and belief, neither Defendant Equifax nor Defendant Trans Union corrected the mix or removed the disputed information from Plaintiff's credit file.

87.    Plaintiff made several attempts to correct her credit report with Defendants Equifax and Trans Union, to no avail.

88.    At the time Plaintiff assumed there was nothing more that she could do because her disputes were unsuccessful.

89.    In or around 2020, Plaintiff was also denied housing because of the derogatory accounts that did not belong to her appearing on her credit reports. Plaintiff had to move in with her parents instead of renting an apartment.

### Plaintiff's Sister Applies for Credit

90.    In May 2024, Plaintiff's sister applied for credit and was denied. Plaintiff's sister reached out to Plaintiff concerning their mixed credit files.

91.    Plaintiff decided to obtain her credit reports to see if the mix was still occurring.

92.    Plaintiff tried, unsuccessfully, to obtain her credit reports from annualcreditreports.com.

93.    Unable to obtain her credit report online, on or about May 28, 2024, Plaintiff called Trans Union to request a copy of her credit report.

94.    Plaintiff received her Trans Union credit report dated May 28, 2024.

95.    Plaintiff was able to get her Experian credit report dated June 11, 2024, and her Equifax credit report dated May 22, 2024, through Experian.com.

96.    Plaintiff immediately noticed that her credit scores varied drastically. Specifically, Experian showed Plaintiff's FICO score on her Experian report as 766. Plaintiff's FICO scores on her Equifax and Trans Union credit reports were approximately 620.

97.    Upon closer review of her credit reports, Plaintiff discovered that Defendants Equifax and Trans Union were reporting many accounts that did not belong to her and her sister's personal identifying information also appeared on her Equifax and Trans Union credit reports.

**Plaintiff's Mixed Equifax Credit File as of May 2024**

98.    Upon reviewing the contents of the May 22, 2024, credit file, Plaintiff was confused by the appearance of several pieces of information that did not belong to Plaintiff at all.

99.    Specifically, Defendant Equifax was reporting the following accounts which upon information and belief did not belong to Plaintiff:

(a)    121 Financial Credit
Account Number: 208938XXXX
Date Opened: January 9, 2020
Status:  Pays as Agreed
Balance: $30, 487

(b)    Bank of America
Account Number: 440066XXXXXXXXXX
Date Opened: December 20, 2014
Status:  Charged-off
Balance: $4,803

(c)    Capital One
Account Number: 414709XXXXXX
Date Opened: May 2, 2016
Status: Pays as Agreed.  15 late payments
Balance: -

(d)    Department of Education/Nelnet
Account Number: 900000XXXXXXXX

Date Opened: October 10, 2014
Status: Pays as Agreed
Balance: $77,147
Original Amount: $60,229

(e)     THD/CBNA
Account Number: 603532XXXXXXXXXX
Date Opened: January 6, 2013
Status: Charge-off
Balance: $2,309

(f)     Bank of America
Account Number: 440066XXXXXXXXXX
Date Opened: March 3, 2016
Status: Charge-off
Balance: $0

(g)     Citicards CBNA
Account Number: 546616XXXXXX
Date Opened: September 15, 2016
Status: Charge-off
Balance: $1,811

(h)     Comenity Bank/Express
Account Number: 174527XXXXXXXXXX
Date Opened: September 21, 2014
Status: Charge-off
Balance: $0

(i)     Comenity Bank/NWYRK&
Account Number: 6XXXX
Date Opened: March 10, 2012
Status: Closed; Pais as Agreed
Balance: $0

(j)     Comenity Capital/Game
Account Number: 778840XXXXXXXXXX
Date Opened: November 26, 2014
Status: Closed
Balance: $0

(k)     Community First Cred
        Account Number: 134735XXXXX
        Date Opened: August 12, 2016
        Status: Closed; Paid as Agreed
        Balance: $0

(l)     Fed Loan Servicing
        Account Number: 701577XXXXXXXXXXX
        Date Opened: October 10, 2014
        Status: Closed; Paid as Agreed
        Balance: $0

(m)     Nordstrom/TD Bank
        Account Number: 447043XXXXXXXXXX
        Date Opened: May 14, 2015
        Status: Charge-off
        Balance: $2,467

(n)     Synchrony Bank/ Car Care Disc
        Account Number: 650159XXXXXXXXXX
        Date Opened: August 8, 2014
        Status: Closed; Paid as Agreed
        Balance: $0

(o)     Synchrony Bank/ Networks
        Account Number: 650172XXXXXX
        Date Opened: August 18, 2014
        Status: Closed; Paid as Agreed
        Balance: $0

(p)     Vystar Credit Union
        Account Number: 400519XXXXXXXXXX
        Date Opened: August 26, 2016
        Status: Closed; Not more than 2 payments past due
        Balance: $4,852

(q)     Cavarly Portfolio SE
        Account Number: 225818XX

24

Original Creditor:  Synchrony Bank
Date Opened: March 18, 2023
Status: Unpaid; Collections
Balance: $456

(r)    Midland Credit Management
Account Number: 317229XXX
Original Creditor:  Comenity Bank
Date Opened: May 26, 2022
Status: Unpaid; Collections
Balance: $361

(s)    Sequium Asset Solutions
Account Number: 567562XX
Original Creditor:  ATT Uverse
Date Opened: January 8, 2024
Status: Paid; Collections
Balance: $0

100.    Further, Defendant Equifax was reporting the following addresses which did not belong to Plaintiff:



(a)    ███████████████████    FL 32225

(b)    ████████████████    32277

(c)    ██████████████████    FL 32225

101.    Further, Defendant Equifax was reporting the following name variation which does not belong to Plaintiff: Elika R Edwards

102.    By reporting the aforementioned credit accounts and other personal information in the credit file presumably about Plaintiff, despite the fact that the accounts and information do not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information

contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

## Plaintiff's Mixed Trans Union Credit File as of May 2024

103.    Upon reviewing the contents of the May 28, 2024 credit file, Plaintiff was confused by the appearance of several pieces of information that did not belong to Plaintiff at all.

104.    Specifically, Defendant Trans Union was reporting the following accounts which upon information and belief did not belong to Plaintiff:

      (a)    Bank of America
              Account Number: 440066930792XXXX
              Date Opened: December 20, 2014
              Status:  Charged-off
              Balance: $4,803

      (b)    Bank of America
              Account Number: 440066816096XXXX
              Date Opened: March 3, 2016
              Status: Paid in full; Was a Charge-off
              Balance: $0

      (c)    Cavarly Port
              Account Number: 2258XXXX
              Original Creditor: Synchrony Bank
              Date Opened: March 18, 2023
              Status: Unpaid; Collections
              Balance: $456

      (d)    Citicards CBNA
              Account Number: 546616040218XXXX
              Date Opened: September 15, 2016
              Status: Charge-off
              Balance: $1,811

    (e)    Comenity Bank/Express
                Account Number: 34824XXXX
                Date Opened: September 21, 2014
                Status: Charge-off
                Balance: $0

    (f)    Comenity Bank/VCTESSEC
                Account Number: 539176133610XXXX
                Date Opened: November 4, 2009
                Status: Closed; Paid as Agreed
                Balance: $0

    (g)    Comenity Capital/Game
                Account Number: 778840003262XXXX
                Date Opened: November 26, 2014
                Status: Closed
                Balance: $0

    (h)    JPMC Card Services
                Account Number: 42668414853XXXX
                Date Opened: December 4, 2012
                Status: Charge-off
                Balance: $5,950

    (i)    Midland Credit Management
                Account Number: 31722XXXX
                Original Creditor:  Comenity Bank
                Date Opened: May 26, 2022
                Status: Unpaid; Collections
                Balance: $361

    (j)    Nordstrom/TD Bank
                Account Number: 447043104334XXXX
                Date Opened: October 14, 2015
                Status: Charge-off
                Balance: $2,467

    (k)    SEQUIUM
                Account Number: 5675XXXX

Date Placed in Collection: January 8, 2024
Status: Account paid in full; was in Collection
Balance: $0

(l)     Synchrony Bank/ Networks
        Account Number: 650172003716XXXX
        Date Opened: August 18, 2014
        Status: Closed; Paid as Agreed
        Balance: $0

(m)     THD/CBNA
        Account Number: 603532039091XXXX
        Date Opened: January 6, 2013
        Status: Charge-off
        Balance: $2,309

(n)     Vystar Credit Union
        Account Number: 400519XXXXXXXXXX
        Date Opened: August 26, 2016
        Status: 30 Days Past Due
        Balance: $4,852

(o)     121 Financial Credit
        Account Number: 208938XXXX
        Date Opened: January 9, 2020
        Status:  Pays as Agreed
        Balance: $30, 487

(p)     Comenity Bank/DVDSBR
        Account Number: 578097960610XXXX
        Date Opened: March 1, 2016
        Status: Closed; Pais as Agreed
        Balance: $0

(q)     Community First Credit Union of FL
        Account Number: 1347350XXXX
        Date Opened: August 12, 2016
        Status: Closed; Paid as Agreed
        Balance: $0

(r)    Department of Education/Nelnet
Account Number: 90000070333XXXX
Date Opened: October 10, 2014
Status: Pays as Agreed
Balance: $77,147

(s)    Fed Loan Servicing
Account Number: 7015775077FD0XXXX
Date Opened: October 10, 2014
Status: Closed; Paid as Agreed
Balance: $0

(t)    Synchrony Bank/ Car Care Disc
Account Number: 650159002167XXXX
Date Opened: August 8, 2014
Status: Closed; Paid as Agreed
Balance: $0

105.    Further, Defendant was also reporting the following account inquiries, with whom Plaintiff did not have an account relationship:

(a)    Ally Card, May 7, 2024

(b)    Capital One, April 7, 2024

(c)    Amex, July 29, 2022

106.    Plaintiff did not apply for credit with any of the aforementioned entities and did not have a relationship with any of the aforementioned entities.  Defendant Trans Union did not have a permissible purpose for furnishing information about Plaintiff to the above-referenced entities on the above-referenced dates.

107.    Upon information and belief, all three of the above-referenced inquiries were initiated by credit applications submitted by Plaintiff's sister.

108.   As Plaintiff had not authorized any of the above-referenced entities to request Plaintiff's credit report from Defendant Trans Union on the above-referenced dates in 2022 and 2024, nor did Plaintiff enter into any business transaction or relationship which otherwise may have provided a basis for those entities securing a copy of Plaintiff's credit report from Defendant Trans Union, Defendant Trans Union disclosed information about Plaintiff to the above-referenced entities without a permissible purpose and in violation of 15 U.S.C. § 1681b(a).

109.   Further, Defendant Trans Union was reporting the following addresses which did not belong to Plaintiff:



(a)                                        FL 32225

(b)                                        FL 32277

(c)                                        FL  32258

110.   Further, Defendant Trans Union was reporting the following name variation which do not belong to Plaintiff:  Elika R Edwards, Elika Villanueva Ranola, Elica V. Ranola.

111.   Further, Defendant Trans Union was reporting the following date of birth that does not belong to Plaintiff: October 9, ▮▮▮▮.

112.   By reporting the aforementioned credit accounts and other personal information in the credit file presumably about Plaintiff, despite the fact that the

accounts and information do not belong to Plaintiff, Defendant failed to follow reasonable procedures to assure the maximum possible accuracy of the information contained within Plaintiff's credit files and consumer reports, in violation of 15 U.S.C. § 1681e(b).

### Plaintiff Applies for a loan with Foundation Financing Company

113.   On June 27, 2024, Plaintiff completed and submitted an application for financing in the amount of $13,328 from Foundation Finance Company to get her bathroom fixed with National Bath, Inc.

114.   For Foundation Finance Company to make a determination on Plaintiff's loan application, it would need to obtain copies of her credit files. Plaintiff provided Foundation Finance Company with her personal identification information, including her Social Security number, and authorized it to obtain copies of her credit files.

115.   On June 27, 2024, Defendant Trans Union sold a credit report about Plaintiff to Foundation Finance Company in response to Plaintiff's loan application.

### Foundation Finance Company Denies Plaintiff's Application

116.   On June 27, 2024, Foundation Finance Company issued an adverse action notice to Plaintiff.  Within that letter, Foundation Finance communicated that it had denied Plaintiff's loan application due to information reported by Defendant Trans Union.

117.   Specifically, Foundation Finance Company's adverse action notice provided the following reason for denying Plaintiff's credit application: "Delinquent Past or Present Credit Obligations with Others."  Plaintiff's credit score was listed as 590.

### Plaintiff Applies for a Loan with Service Finance Company

118.   Plaintiff also attempted to obtain financing for her bathroom renovations with Service Finance Company.

119.   On June 27, 2024, Plaintiff completed and submitted an application for financing in the amount of $13,328 from Service Finance Company to get her bathroom fixed with National Bath, Inc.

120.   For Service Finance Company to make a determination on Plaintiff's loan application, it would need to obtain copies of her credit files.  Plaintiff provided Foundation Finance Company with her personal identification information, including her Social Security number, and authorized it to obtain copies of her credit files.

121.   On or about July 4, 2024, Defendant Trans Union sold a credit report about Plaintiff to Service Finance Company in response to Plaintiff's loan application.

//

**Service Finance Company Denies Plaintiff's Application**

122.   On or about July 4, 2024, Service Finance Company issued an adverse action notice to Plaintiff.  Within that letter, Service Finance communicated that it had denied Plaintiff's loan application due to information reported by Defendant Trans Union.

123.   Specifically, Service Finance Company's adverse action notice provided the following key factors that affected Plaintiff's credit score which was listed as 624: serious delinquencies or collection, proportion of balances to credit limits and time since delinquency being too recent.

124.   The adverse action letter from Service Finance Company was addressed to "Elika Ranola."  Upon information and belief, Plaintiff provided her correct name, but Service Finance Company used the name they saw on the credit report they obtained from Defendant Trans Union.

125.   There are no hard inquiries listed on Plaintiff's Trans Union credit reported dated October 23, 2024, for Foundation Finance Company nor for Service Finance Company.  Upon information and belief, Defendant Trans Union provided Foundation Finance Company and Service Finance Company Plaintiff's sister's credit report when they requested Plaintiff's credit information from Trans Union.

126. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

**Plaintiff's August 2024 Dispute to Defendants**

127. On or about August 5, 2024, worried that something was very wrong with her credit file, Plaintiff sent dispute letters to Defendants Equifax and Trans Union, via certified mail, and disputed the inaccuracies. Specifically, Plaintiff disputed the information that did not belong to her.

128. Along with her dispute letter, Plaintiff enclosed a copy of her driver's license and social security card to better assist Defendants in identifying her in their systems. Plaintiff also provided a copy of her Freedom Mortgage Life Insurance Benefit Statement to verify her address.

129. Plaintiff requested that Defendants reinvestigate the disputed information, correct the reporting, and send her a corrected copy of her credit reports.

**The Credit Bureaus' Method for Considering
Consumer Credit Report Disputes**

130. The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

131. The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the

credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

132.   That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

133.   It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

134.   Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

135.   Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

136.   The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

137.   These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

138.   Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

139.   The data furnishers then have an obligation under the FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

140.   Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and returning the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

141.   On or about August 20, 2024, Trans Union sent Plaintiff a letter acknowledging her dispute but saying that Plaintiff's proof of address was unacceptable.

142.   Upon information and belief, Defendant Trans Union unjustifiably refused to reinvestigate Plaintiff's August 2024 dispute.  Defendant Trans Union failed to conduct a reasonable investigation of Plaintiff's August 2024 dispute, or

any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

143.    On or about October 19, 2024, Plaintiff mailed a written request for her Trans Union report to Annual Credit Report.  The mailed request included proof of address, a copy of her social security card and her photo identification.

144.    In response to Plaintiff's written request, Plaintiff received a Trans Union credit report dated October 23, 2024.

145.    The Trans Union consumer disclosure listed the correct personal identifying information for Plaintiff.    However, Defendant Trans Union only included two of Plaintiff's accounts:

    (a)    Department of Education/Nelnet
                Account:90000086470XXXX
                Opened: September 25, 2024
                Balance: $2,002
                Status: Current; Paid as Agreed

    (b)    Department of Education/Nelnet
                Account:90000086470XXXX
                Opened: September 25, 2024
                Balance: $6,843
                Status: Current; Paid as Agreed

146.    All of Plaintiff's other credit history had been removed from her Trans Union report.  The Trans Union disclosure also included no hard inquiries.

147.   Upon information and belief, Defendant Trans Union failed to unmix Plaintiff's credit file from that of her sister Elika Edwards and likely Defendant Trans Union is reporting all of Plaintiff's accounts in the credit file of her sister's and not her own.

148.   As a result of Defendant Trans Union's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

**Defendant Equifax's Unreasonable Dispute Reinvestigation**

149.   On or about September 7, 2024, Defendant Equifax responded to Plaintiff's August 2024 dispute.

150.   Upon reviewing the contents of the September 7, 2024, credit file, Plaintiff saw that Defendant Equifax deleted some of the disputed, unrecognized information, but Plaintiff was distressed to see that Defendant Equifax incorrectly verified some of the disputed information as accurate and continued to report it.

151.   Additionally, Plaintiff was upset to see that Defendant Equifax deleted some information from Plaintiff's credit file that Plaintiff did not dispute as being inaccurate.

152.   Upon reviewing the contents of the September 7, 2024, credit file, Defendant Equifax correctly deleted the following disputed information:

   i.   All name variations that did not belong to Plaintiff

   ii.   Two of the disputed addresses: ███████████████    FL 32277 and ███████████████    FL 32225

   iii. Eight disputed accounts: Bank of America (*4050), Nordstrom/TD Bank (*2518), Community First Credit (*0001), Citicards CBNA (*1844), THD/CBNA (*1491), Capital One (*9784), Midland Credit Management (*9264), and Synch/Car Care Dis (*2762)

153.   Defendant Equifax incorrectly verified the following four disputed accounts that did not belong to Plaintiff as accurate and continued to report them:

   i.   121 Financial Credit Union (*0001),

     ii.     Comenity Bank/NWYRK& (*4704),

     iii.    Vystar Credit Union (*1605), and

     iv.    Comenity Bank/Express (174527XXXX).

154.   In addition, Defendant deleted the following two undisputed accounts that belong to Plaintiff from Plaintiff's credit report:

     i.     American Express (*0002) and

     ii.    Synch/HHGR (*4971)

155.   There was also some confusion with the following information that Equifax identified as being investigated but stated that it was not being reported:

     i.     █████████████ FL 32225 – Equifax correctly states that it is not currently reporting this address.  "Fills" was a typo in Plaintiff's dispute letter.  The address Plaintiff meant to dispute was ███████ █████████ Jacksonville, FL 32225.  This address is still being reported.

     ii.   Comenity Bank Express (*4527) - Equifax states it is not currently reporting.  Plaintiff did not dispute this account ending in 4527.  The account Plaintiff disputed was Comenity Bank Express ending in 6096.  The disputed account, Comenity Bank Express ending in 6096 is still reporting.

156.   Upon information and belief, Defendant Equifax failed to unmix Plaintiff's credit file from that of her sister Elika Edwards and likely Defendant Equifax continues reporting Plaintiff's sister's information in Plaintiff's credit file.

157.   As a result of Defendant Equifax's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

158.   Upon receipt of Plaintiff's August 2024 disputes, Defendants were required to send a dispute notice, including but not limited to an ACDV, to the furnishers regarding the credit accounts disputed by Plaintiff.

159.   Defendants either failed to send a dispute notice, including but not limited to an ACDV, to the furnishers or the furnishers verified to Defendants that the disputed information belonged to Plaintiff and was accurately reporting on Plaintiff's credit report and/or in Plaintiff's credit file.

160.   Defendants failed to conduct a reasonable investigation of Plaintiff's August 2024 disputes, or any reinvestigation whatsoever, to determine whether the disputed information was inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

161.   Thereafter, and upon information and belief, Defendants failed to unmix Plaintiff's credit file from that of her sister's and likely Defendants continued to report her sister's information to Plaintiff's credit file.

162.   Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy of the credit information it published and maintained concerning Plaintiff.

163.   Upon information and belief, because Defendants continue to mix Plaintiff's credit file with that of her sister's, Defendants continues to sell Plaintiff's credit file in response to applications and inquiries pertaining to her sister.

164.   As a result of the "mixed file," Defendants made it practically impossible for Plaintiff to obtain credit.

165.   At all times pertinent hereto, Defendants were acting by and through their agents, servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

166.   At all times pertinent hereto, Defendants' conduct, as well as that of its respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

167.   As a standard practice, Defendants does not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the credit furnisher, despite numerous court decisions admonishing this practice. *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681(a) must consist of something more than merely parroting information received from other sources.   Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed);

*Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at \*6 (S.D.N.Y. Nov. 19, 2008).

168.   Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower its costs.   Accordingly, Defendants' violations of the FCRA are willful.

169.   As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

//

44

## **CLAIMS FOR RELIEF**

**COUNT I**
**15 U.S.C. § 1681e(b)**
**Failure to Follow Reasonable Procedures to Assure**
**Maximum Possible Accuracy**
**(First Claim for Relief Against Defendant Equifax and Trans Union)**

170. Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

171. The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

172. On at least one occasion, Defendants prepared patently false consumer reports concerning Plaintiff.

173. Defendants mixed another consumer's personal and credit account information into Plaintiff's credit file, thereby misrepresenting Plaintiff, and ultimately, Plaintiff's creditworthiness.

174. Defendants violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the

preparation of the credit reports and credit files they published and maintained concerning Plaintiff.

175.   As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

176.   Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.   Alternatively, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

177.   Plaintiff is entitled to recover attorneys' fees and costs from Defendants in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
## 15 U.S.C. § 1681i
## Failure to Perform a Reasonable Reinvestigation
## (Second Claim for Relief Against Defendant Equifax and Trans Union)

178.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

179.   The FCRA mandates that Defendants conduct a reasonable reinvestigation of the accuracy of information "[i]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer. *See* 15 U.S.C. § 1681i(a)(1).   The FCRA imposes a 30-day time limit for the completion of such an investigation. *Id*.

180.   The FCRA provides that if Defendants conduct their reinvestigation of disputed information and confirms that the information is, in fact, inaccurate or it is unable to otherwise verify the accuracy of the disputed information, they are required to delete the item of information from the consumer's file.  *See* 15 U.S.C. § 1681i(a)(5)(A).

181.   Plaintiff initiated a dispute with Defendants and disputed inaccurate information reporting in her credit file and requested that Defendants correct and/or

delete the inaccurate, misleading, and highly damaging information belonging to an unrelated consumer.

182.    Defendants failed to conduct an investigation of Plaintiff's dispute, or such investigation, if any, was so unreasonable as to allow patently false and highly damaging information to remain in Plaintiff's credit file.

183.    Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which it received notice of Plaintiff's dispute; and by failing to maintain reasonable procedures with which to filter and verify information in Plaintiff's credit files.

184.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the

mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

185.   Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.   Alternatively, Defendants were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

186.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
## 15 U.S.C. § 1681b(a)
### Furnishing a Credit Report Without a Permissible Purpose
### (Third Claim for Relief Against Defendant Trans Union)

187.   Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

188.   This action involves the willful, knowing, and/or negligent violation of the FCRA relating to the dissemination of consumer credit and other financial information.

189.   Plaintiff is a "consumer" as defined by the FCRA.

190.   Defendant Trans Union is a consumer reporting agency that furnishes consumer reports as defined and contemplated by the FCRA.

191.   The FCRA prohibits any consumer reporting agency from furnishing a consumer report unless it has a permissible purpose enumerated under the FCRA, 15 U.S.C. § 1681b(a).

192.   On multiple occasions, Defendant Trans Union furnished Plaintiff's credit report to various entities without a permissible purpose in response to credit applications of another, which did not involve Plaintiff, and which Defendant Trans Union therefore had no reason to believe that those various credit-issuing entities intended to use Plaintiff's credit information in connection with a credit transaction involving Plaintiff, in violation of 15 U.S.C. § 1681b(a).

193.   Defendant Trans Union violated 15 U.S.C. § 1681b(a) by selling Plaintiff's credit report to third parties, whom did not have a permissible purpose to Plaintiff's credit report, in relation to the credit application of an unrelated consumer.

194.   As a result of Defendant Trans Union's conduct, action, and inaction, Plaintiff suffered damages including but not limited to, the loss of her right to keep her private financial information confidential; the loss of her right to information about who was viewing her private financial information and how her private financial information was improperly implicated in the credit applications of another; damage by loss of credit; loss of ability to purchase and benefit from her

good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials and having another consumer's personally identifying information and credit information, including inquiries, mixed into Plaintiff's credit file.

195.   Defendant Trans Union's conduct, actions, and inactions was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, Defendant Trans Union was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

196.   Plaintiff is entitled to recover attorneys' fees and costs from Defendant Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendants negligently and/or willfully violated the FCRA;

ii.      Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.     Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.      Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.

RESPECTFULLY SUBMITTED this 29th day of April 2025,

/s/ *Catherine Tillman*
Catherine Tillman, Esq., FL #0057663
**CONSUMER JUSTICE LAW FIRM   PLC**
8095 N. 85th Way
Scottsdale, AZ 85258
T: (941) 263-7310
F: (480) 613-7733
E: ctillman@consumerjustice.com

*Attorneys for Plaintiff*
*Eliza Ranola*